**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY & COUNTY OF HONOLULU,
                    *Plaintiff-Appellee*,

v.

SUNOCO LP; ALOHA PETROLEUM,
LTD.; EXXON MOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
SHELL PLC; SHELL USA, INC.;
SHELL OIL PRODUCTS COMPANY
LLC; CHEVRON CORPORATION;
CHEVRON USA INC.; BHP GROUP
LIMITED; BHP PLC; BHP HAWAII
INC.; BP PLC; BP AMERICA, INC.;
MARATHON PETROLEUM CORP.;
CONOCOPHILLIPS; CONOCOPHILLIPS
COMPANY; PHILLIPS 66 COMPANY;
ALOHA PETROLEUM LLC,
                    *Defendants-Appellants*,

and

DOES, 1 through 100 inclusive,
                    *Defendant.*

No. 21-15313

D.C. No.
1:20-cv-00163-
DKW-RT

COUNTY OF MAUI,
            *Plaintiff-Appellee*,

v.

CHEVRON USA INC.; CHEVRON
CORPORATION; SUNOCO LP; ALOHA
PETROLEUM, LTD.; ALOHA
PETROLEUM LLC; EXXON MOBIL
CORPORATION; EXXONMOBIL OIL
CORPORATION; SHELL PLC; SHELL
USA, INC.; SHELL OIL PRODUCTS
COMPANY LLC; BHP GROUP
LIMITED; BHP GROUP PLC; BHP
HAWAII INC.; BP PLC; BP AMERICA,
INC.; MARATHON PETROLEUM CORP.;
CONOCOPHILLIPS; CONOCOPHILLIPS
COMPANY; PHILLIPS 66 COMPANY,
            *Defendants-Appellants*,

and

DOES, 1 through 100 inclusive,
            *Defendant*.

No. 21-15318

D.C. No.
1:20-cv-00470-
DKW-KJM

OPINION

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted February 17, 2022
Submission Vacated February 22, 2022
Resubmitted June 29, 2022
Honolulu, Hawaii

Filed July 7, 2022

Before:  Michael Daly Hawkins, Ryan D. Nelson, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge R. Nelson

# SUMMARY[*]

## Climate-Related Claims / Federal Jurisdiction

Affirming the district court's order remanding to state court climate-related claims against numerous oil and gas companies, the panel held that defendants could not show federal jurisdiction.

Plaintiffs alleged that the oil and gas companies knew about climate change, understood the harms energy exploration and extraction inflicted on the environment, and concealed those harms from the public. Plaintiffs sued in Hawaii state court, asserting state-law public and private nuisance, failure to warn, and trespass claims. The complaints asserted that defendants' deception caused harms from climate change, like property damage from extreme weather and land encroachment because of rising sea levels.

The panel held that removal from state court was not proper under federal officer jurisdiction, which required defendants to show that they were "acting under" federal officers, that they could assert a colorable federal defense, and that plaintiffs' injuries were for or relating to defendants' actions. The panel held that defendants did not act under federal officers when they produced oil and gas during the Korean War and in the 1970s under the Defense Production Act, when they repaid offshore oil leases in kind and contracted with the government to operate the Strategic Petroleum Reserve, when they conducted offshore oil operations, or when they operated the Elk Hills oil reserve,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

an oil field run jointly by the Navy and Standard Oil. The panel further held that defendants did not assert a colorable federal defense by citing the government-contractor defense, preemption, federal immunity, the Interstate and Foreign Commerce Clauses, the Due Process Clause, the First Amendment, and the foreign affairs doctrine. The panel concluded that most of these defenses failed to stem from official duties, and the government-contractor and immunity defenses were not colorable.

The panel held that defendants did not establish federal enclave jurisdiction because they could not show that activities on federal enclaves directly caused plaintiffs' injuries. The panel explained that plaintiffs' claims were not about defendants' oil and gas operations, and defendants' activities on federal land were too remote and attenuated from plaintiffs' injuries.

Finally, the panel held that defendants did not establish jurisdiction under the Outer Continental Shelf Lands Act because their activities on the Outer Continental Shelf were too attenuated from plaintiffs' injuries.

**COUNSEL**

Theodore J. Boutrous Jr. (argued) and William E. Thomson, Gibson Dunn & Crutcher LLP, Los Angeles, California; Thomas G. Hungar, Gibson Dunn & Crutcher LLP, Washington, D.C.; for Defendants-Appellants.

Victor M. Sher (argued), and Matthew K. Edling, Sher Edling LLP, San Francisco, California; Monana M. Lutey, Corporation Counsel; Richelle M. Thomson and Keola R. Whittaker, Deputies Corporation Counsel; Office of the Corporation Counsel, Wailuku, Hawai'i; Dana M.O. Viola, Corporation Counsel; Robert M. Kohn, Nicolette Winter, and Jeff A. Lau, Deputies Corporation Counsel; Office of the Corporation Counsel, Honolulu, Hawai'i; for Plaintiff-Appellee.

William M. Jay and Andrew Kim, Goodwin & Procter LLP, Washington, D.C.; Andrew R. Varcoe and Stephanie A. Maloney, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

Tristan L. Duncan, Shook Hardy & Bacon LLP, Kansas City, Missouri; Tammy Webb, Shook Hardy & Bacon LLP, San Francisco, California; for Amici Curiae General (Retired) Richard B. Myers and Admiral (retired) Michael G. Mullen.

Robert S. Peck, Center for Constitutional Litigation PC, Washington, D.C., for Amici Curiae National League of Cities, U.S. Conference of Mayors, and International Municipal Lawyers Association.

Daniel P. Mensher and Alison S. Gaffney, Keller Rohrback LLP, Seattle, Washington, for Amici Curiae Robert Brulle, Center for Climate Integrity, Justin Farrell, Benjamin Franta, Stephan Lewandowsky, Naomi Oreskes, Geoffrey Supran, and Union of Concerned Scientists.

William A. Rossbach, Rossbach Law PC, Missoula, Montana, for Amicus Curiae Charles Fletcher.

Michael R. Cruise, Leavitt Yamane & Soldner, Honolulu, Hawaiʻi; Chase H. Livingston, Honolulu, Hawaiʻi; for Amici Curiae Legal Scholars.

Miranda C. Steed, Jon S. Jacobs LLLC, Honolulu, Hawaiʻi, for Amicus Curiae Hawaiʻi State Association of Counties.

Clare E. Connors, Attorney General; Kimberly T. Guidry, Solicitor General; Ewan C. Rayner and Kalikoʻonālani D. Fernandes, Deputy Solicitors General; Department of the Attorney General, Honolulu, Hawaiʻi; Rob Bonta, Attorney General, Sacramento, California; William Tong, Attorney General, Hartford, Connecticut; Kathleen Jennings, Attorney General, Wilmington, Delaware; Brian E. Frosh, Attorney General, Baltimore, Maryland; Keith Ellison, Attorney General, Saint Paul, Minnesota; Andrew J. Bruck, Acting Attorney General, Trenton, New Jersey; Hector Balderas, Attorney General, Santa Fe, New Mexico; Letitia James, Attorney General, Albany, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Peter F. Neronha, Attorney General, Providence, Rhode Island; Robert W. Ferguson, Attorney General, Olympia, Washington; Maura Healey, Attorney General, Boston, Massachusetts; Karl A. Racine, Attorney General, Washington, D.C.; for Amici Curiae States of Hawaiʻi, California, Connecticut, Delaware, Maryland, Minnesota,

New Jersey, New Mexico, New York, Oregon, Rhode Island, Washington, the Commonwealth of Massachusetts, and District of Columbia.

## OPINION

R. NELSON, Circuit Judge:

The City and County of Honolulu and the County of Maui (Plaintiffs) seek to bring climate-related claims against numerous oil and gas companies (Defendants). The question before us has nothing to do with the merits of those claims, but only whether they belong in federal court.

We do not write on a blank slate. Various oil company defendants have sought removal four times in similar climate change suits, including in this Court. *See County of San Mateo v. Chevron Corp.* (*San Mateo II*), 32 F.4th 733 (9th Cir. 2022); *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44 (1st Cir. 2022); *Mayor of Baltimore v. BP P.L.C.* (*Baltimore II*), 31 F.4th 178 (4th Cir. 2022); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022). Similar to here, defendants in those cases contended that removal was proper under jurisdiction for federal officers, federal enclaves, and the Outer Continental Shelf Lands Act (OCSLA). Following precedent and consistent with our sister circuits, we reject these arguments. Because Defendants cannot show federal jurisdiction, we affirm.

I

Plaintiffs allege that oil and gas companies knew about climate change, understood the harms energy exploration and extraction inflicted on the environment, and concealed

those harms from the public.  Plaintiffs sued in Hawaii state court, asserting state-law public and private nuisance, failure to warn, and trespass claims.  The Complaints assert that Defendants' deception caused harms from climate change, like property damage from extreme weather and land encroachment because of rising sea levels.

Defendants removed, asserting eight jurisdictional grounds.  Plaintiffs sought to remand.  After addressing the three removal grounds at issue before us, the district court remanded.  Defendants now appeal and we have consolidated the two appeals.

## II

We have jurisdiction to review the district court's remand order under 28 U.S.C. §§ 1291, 1447(d).  *BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1538 (2021).  We review the district court's decision de novo.  *Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 849 (9th Cir. 2020).

## III

Defendants' arguments lack merit.  For federal officer jurisdiction, Defendants must show: (1) they were "acting under" federal officers, (2) they can assert a colorable federal defense, and (3) Plaintiffs' injuries were for or relating to Defendants' actions.  Most arguments fail the first prong, and all fail the second.  For federal enclave jurisdiction, Defendants cannot show that activities on federal enclaves directly caused Plaintiffs' injuries.  And for jurisdiction under OCSLA, Defendants' activities on the Outer Continental Shelf (OCS) are too attenuated from Plaintiffs' injuries.  We address each argument in turn.

A

The federal officer removal statute allows defendants to remove a "civil action . . . that is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) . . . in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Exercising "prudence and restraint," "we strictly construe the removal statute against removal jurisdiction." *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056–57 (9th Cir. 2018) (citation omitted). To establish federal jurisdiction, a defendant must show that (a) "it is a person within the meaning of the statute"; (b) "it can assert a colorable federal defense"; and (c) "there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims." *San Mateo II*, 32 F.4th at 755 (citing *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986–87 (9th Cir. 2019)). Because the parties agree that corporations are persons, the disputes are (1) whether Defendants acted under federal officers, (2) whether Defendants can assert colorable federal defenses, and (3) whether the lawsuits are for or relating to Defendants' actions. We need only address prongs one and two.

1

The first prong is "acting under" federal officers. 28 U.S.C. § 1442(a)(1). "The words 'acting under' are broad, and . . . the statute must be 'liberally construed.'" *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). In *San Mateo II*, we identified four factors to determine whether a person was "acting under" a federal officer: (1) working under an officer "in a manner akin to an agency relationship"; (2) being "subject to the officer's close

direction, such as acting under the . . . 'guidance, or control' of the officer" or having an "unusually close" relationship "involving detailed regulation, monitoring, or supervision"; (3) helping fulfill "basic governmental tasks"; and (4) conducting activities "so closely related to the government's implementation of its federal duties that the . . . person faces 'a significant risk of state-court prejudice.'" 32 F.4th at 756–57 (citing *Watson*, 551 U.S. at 151–53).

We gave several examples in *San Mateo II*. We noted that a private party acts under the government when the party is a contractor given detailed specifications and ongoing supervision to help fight a war. *San Mateo II*, 32 F.4th at 757 (citing *Watson*, 551 U.S. at 153–54 (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399–400 (5th Cir. 1998), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020))). On the other hand, neither "an arm's-length business arrangement with the federal government" nor "suppl[ying] it with widely available commercial products or services" are enough to show "acting under" a federal officer. *Id.* Compliance with the law and obeying federal orders are also not enough, "even if the regulation is highly detailed and . . . the private firm's activities are highly supervised and monitored." *Id.* (quoting *Watson*, 551 U.S. at 153). Finally, we said that courts "may not interpret [the removal statute] so as to 'expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.'" *Id.* (quoting *Watson*, 551 U.S. at 153).

Defendants argue that they acted under federal officers in six ways. Two arguments fail because they set out only normal commercial or regulatory relationships that do not involve detailed supervision. We rejected two in *San Mateo*

*II*, and Defendants' new factual points do not change the outcome. And we need not reach the last two. Even if Defendants acted under federal officers, they still fail the colorable federal defense prong.

a

Defendants did not act under federal officers when they produced oil and gas during the Korean War and in the 1970s under the Defense Production Act (DPA). DPA directives are basically regulations. *See* Michael H. Cecire & Heidi M. Peters, Cong. Rsch. Serv., R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress 4–7 (2020). When complying, Defendants did not serve as government agents and were not subject to close direction or supervision. The government sometimes invoked the DPA in wartime, but unlike *Winters*, Defendants' compliance with the DPA was only lawful obedience. *See Watson*, 551 U.S. at 153 (citing *Winters*, 149 F.3d at 387). That is not enough. *See San Mateo II*, 32 F.4th at 759–60.

b

Next, Defendants argue that they acted under federal officers when they repaid offshore oil leases in kind and contracted with the government to operate the Strategic Petroleum Reserve (SPR). Their argument fails because Defendants did not act as government agents, there was not close direction or supervision, and Defendants' actions were more like an arm's-length business deal.

The SPR is a federally owned oil reserve created after the 1973 Arab oil embargo. Heather L. Greenley, Cong. Rsch. Serv., R46355, The Strategic Petroleum Reserve: Background, Authorities, and Considerations 1–2 (2020).

Many Defendants pay for offshore leases in oil and deliver it to the SPR.  Another Defendant leases and operates the SPR and by contract must support the government if there is a drawdown on the reserve.

But Defendants cannot show "acting under" jurisdiction for SPR activities.  First, payment under a commercial contract—in kind or otherwise—does not involve close supervision or control and does not equal "acting under" a federal officer.  Second, operating the SPR involves a typical commercial relationship and Defendants are not subject to close direction.  *See San Mateo II*, 32 F.4th at 756–57.  Relative to *Winters*, 551 U.S. at 153, the government's directions here are more general and involve fewer detailed specifications and less ongoing supervision.

c

Defendants also did not act under federal officers when conducting offshore oil operations.  Under OCSLA, the federal government offers private parties leases for offshore fossil fuel exploration, development, and production.  43 U.S.C. §§ 1331–1356b.  But in *San Mateo II* we rejected "acting under" for offshore oil and gas operations under these federal leases.  32 F.4th at 759–60.  We reasoned that "[t]he leases do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties," there was not a significant risk of state court prejudice, and the leases' obligations "largely track[ed] statutory requirements."  *Id.* (citing *Watson*, 551 U.S. at 152).

Using new factual arguments, Defendants try to surmount *San Mateo II*.  They contend that Congress studied creating a national oil company and that offshore oil resources are a national security asset.  And they show how

the government controls offshore oil operations under federal leases.

Yet Defendants break no new ground.  Congress endorsed oil operations and considered making a national oil company, but that does not show that oil production was a basic governmental task.  Government oversight for offshore leases is not enough to transform activities that *San Mateo II* rejected into ones showing "close direction."  *Id.* at 759.

Defendants rely on a history professor who specializes in oil exploration.  The professor chronicles offshore oil leases and government control over such operations, which Defendants contend show a high degree of supervision.  But the government orders show only a general regulation applicable to all offshore oil leases.  Indeed, Defendants' expert portrays the "OCS orders" as "directions and clarifications to all operators on how to meet the requirements in the C.F.R."  General government orders telling Defendants how to comply are not specific direction and supervision, which the removal statute requires.  *Cf., e.g.*, *Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir. 2014) ("[T]he Navy issued detailed specifications governing the form and content of all warnings . . . on the equipment itself and in accompanying technical manuals.").

Defendants also argue that government "regional supervisor[s] still had to make adaptive and discretionary decisions" pertaining to individual operations.  But these were decisions like approving certain actions on a well or giving specific waivers to excuse compliance with regulations, not directing or supervising operations generally.  The government also set overall production levels for wells.  Yet the orders were general regulations that applied to everyone rather than "unusually close" direction or supervision. *See Watson*, 551 U.S. at 153.  We agree with

the district court that the leases do not show sufficient direction to meet the "acting under" prong. *City of Honolulu v. Sunoco LP*, No. 20-cv-00163, 2021 WL 531237, at *5–6 (D. Haw. Feb. 12, 2021).

d

Finally, Defendants did not act under federal officers in operating the Elk Hills oil reserve. Elk Hills was an oil field run jointly by the Navy and Standard Oil, a predecessor of Chevron. *See United States v. Standard Oil Co.*, 545 F.2d 624, 626–28 (9th Cir. 1976). Because of interconnected underground oil, the parties agreed to coordinate. *San Mateo II*, 32 F.4th at 758. And "[b]ecause the Navy sought to limit oil production . . . in the event of a national emergency, the . . . agreement required that both Standard [Oil] and the Navy curtail their production and gave the Navy 'exclusive control over the exploration, prospecting, development, and operation of the Reserve.'" *Id.* at 758–59.

In *San Mateo II*, we rejected the "acting under" argument for Standard Oil's Elk Hills operations. *Id.* at 759–60. Rather than acting for the government, Standard Oil and the Navy had "reached an agreement that allowed them to coordinate their use of the oil reserve in a way that would benefit both parties," and so "Standard [Oil] was acting independently." *Id.* at 759.

As with the OCS leases, Defendants try to sidestep *San Mateo II*. They offer a different contract between the parties ("Operating Agreement"), which is separate from the "Unit Production Contract" in *San Mateo II*. Defendants argue that the Navy had "exclusive control" over the time and rate of exploration, and over the quantity and rate of production at Elk Hills. And Defendants uncovered evidence showing that the Navy employed Standard Oil.

We reject Defendants' arguments.  While one could read the language about the Navy's "exclusive control" as detailed supervision, what instead happened was the Navy could set an overall production level or define an exploration window, and Standard Oil could act at its discretion.  The agreement gave Standard Oil general direction—not "unusually close" supervision.  *Sunoco*, 2021 WL 531237, at *6.

Besides, we have already held that a similar arrangement did not meet the "acting under" prong.  *See Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 727–29 (9th Cir. 2015).  In *Cabalce*, we studied a relationship between the government and a contractor in which the contractor had to act "as prescribed and directed by" the government.  *Id.* at 724.  Yet we held that the defendant was not "acting under" federal officers.  *Id.* at 730.  We noted that "the contract define[d] [the defendant's] duties . . . in general terms," and the contractor was the one who decided how to fulfill those duties.  *Id.* at 728.  The same logic applies here.  The contract gave Standard Oil duties in general terms, and Standard Oil was free to fulfill them as desired.  Such an arrangement does not rise to the level of "acting under."

## 2

Prong two requires Defendants to "assert a colorable federal defense."  *San Mateo II*, 32 F.4th at 755 (citing *Riggs*, 939 F.3d at 986–87).  The defense must "aris[e] out of [defendant's] official duties."  *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981).  And in assessing whether a defense is colorable, we must not be "grudging."  *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).  The Supreme Court even held that a rejected federal defense could be colorable.  *Id.*; *see Stirling v. Minasian*, 955 F.3d 795, 801 (9th Cir. 2020) ("We do not express a view on whether this

defense is 'in fact meritorious'; we hold only that it is 'colorable.'" (citing *Leite*, 749 F.3d at 1124)).

To satisfy this prong, Defendants cite the government-contractor defense, preemption, federal immunity, the Interstate and Foreign Commerce Clauses, the Due Process Clause, the First Amendment, and the foreign affairs doctrine. For some of these, as the district court put it, Defendants have "simply assert[ed] a defense and the word 'colorable' in the same sentence." *Sunoco*, 2021 WL 531237, at *7 (citation omitted). Overall, the defenses fail to stem from official duties or are not colorable.

Most defenses do not flow from official duties. For instance, Defendants argue that they cannot be "held liable consistent with the First Amendment for alleged 'roles in denialist campaigns to misinform and confuse the public.'" Even if this defense is colorable, it does not arise from official duties, as Defendants do not contend that the government ordered their allegedly deceptive acts. Defendants' due process, Interstate and Foreign Commerce Clauses, foreign affairs doctrine, and preemption defenses similarly do not arise from official duties.

That leaves the government contractor and immunity defenses. But Defendants do not show that these defenses are colorable. On the government contractor defense, Defendants cite two cases that dealt with design defect claims, not failure to warn claims. *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing Co.*, 654 F.3d 852 (9th Cir. 2011). And for their immunity defense, Defendants argue that because they produced oil and gas "at the direction of the federal government, . . . they are immune from liability for any alleged injuries." *Sunoco*, 2021 WL 531237, at *7.

It is true that we must not be "grudging" in assessing whether asserted federal defenses are colorable, *Acker*, 527 U.S. at 431, and a defendant "need not win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). Still, Defendants' conclusory statements and general propositions of law do not make their defenses colorable. Thus, we reject federal officer jurisdiction.

B

Federal enclave jurisdiction refers to the principle that federal law applies in federal enclaves. *San Mateo II*, 32 F.4th at 748–49 (citing U.S. Const. art. I, § 8, cl. 17). When the federal government buys state land, unless one of three narrow exceptions apply (none of which are relevant here), federal law governs. *Id.* at 749 (citing *Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952)). This means a federal court may have federal question jurisdiction based on injuries arising from conduct on the enclave. *Id.*; *see Alvares v. Erickson*, 514 F.2d 156, 160 (9th Cir. 1975) (noting that there is federal jurisdiction if the claim's locus is in a federal enclave); *cf. Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1003 (9th Cir. 2021) (noting that federal jurisdiction is not exclusive if there is concurrent state jurisdiction).

We invoke the doctrine of federal enclave jurisdiction narrowly. *See San Mateo II*, 32 F.4th at 749–50 (finding no jurisdiction where plaintiffs raised state-law claims arising from injury to local property); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding jurisdiction for asbestos exposure on a federal enclave). A claim must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave. *San Mateo II*, 32 F.4th at 749–50. And the connection between injuries and conduct must not be "too

attenuated and remote." *Id.* at 750.  For example, a defendant cannot use activities on federal enclaves to create instant jurisdiction for a state-law claim.  *See, e.g.*, *Lake*, 14 F.4th at 1002 ("[T]here is no reason to treat the resulting state laws as if they were assimilated into federal law."); *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1238 (10th Cir. 2012) ("[N]o federal statute yet allows the broad application of state employment, tort, and contract law to federal enclaves.").

In *San Mateo II*, the defendants asserted that energy companies had engaged in activities on federal enclaves possibly leading to global warming and rising seas.  32 F.4th at 750.  But while the defendants identified some conduct on federal enclaves, any connection between that conduct and the plaintiffs' alleged injuries was too remote.  *Id.*  The plaintiffs' claims asserted property damage in local areas. *Id.* at 749–50.  So we rejected the idea that the plaintiffs' injuries arose from fossil fuel operations on federal enclaves. *Id.* at 750–51 (citing *Gunn v. Minton*, 568 U.S. 251, 258 (2013)).

Defendants do not satisfy federal enclave jurisdiction. Plaintiffs' claims are not about Defendants' oil and gas operations, and Defendants' activities on federal enclaves are too remote and attenuated from Plaintiffs' injuries.

Like *San Mateo II*, the Complaints do not attack Defendants' underlying conduct.  *See* 32 F.4th at 744.  Yet Defendants try to recharacterize the claims from deceptive practices to activities on federal enclaves.  *Sunoco*, 2021 WL 531237, at *8.  But "[t]he plaintiff is 'the master of the claim.'"  *San Mateo II*, 32 F.4th at 746 (quoting *City of Oakland v. BP PLC*, 969 F.3d 895, 904 (9th Cir. 2020)).  We agree with the district court: "[i]t would require the most

tortured reading of the Complaints to find" jurisdiction. *Sunoco*, 2021 WL 531237, at *8.

Defendants try another ploy. They argue that because some conduct happened on federal enclaves, the conduct relates to injuries from Defendants' deceptive practices. We reject such a broad application. Under *San Mateo II*, Defendants' alleged tortious conduct is too attenuated from Plaintiffs' claimed injuries. Federal enclave jurisdiction needs a direct connection between the injury and conduct. *San Mateo II*, 32 F.4th at 750. As in *San Mateo II*, there is no link. Even if much of Defendants' oil and gas operations occurred on federal enclaves, that still does not transform Plaintiffs' claims about deceptive practices into claims about the conduct itself. *See Suncor*, 25 F.4th at 1272 ("[A]lleged climate alteration by [the Energy Companies] . . . does not speak to the nature of [the plaintiffs'] alleged injuries." (citation omitted)).

Plaintiffs' claims do not implicate federal enclave activities. Nor is Defendants' conduct tied directly to Plaintiffs' claimed injuries. Following *San Mateo II*, we rebuff Defendants' arguments.

C

OCSLA permits federal jurisdiction over actions "arising out of, or in connection with" operations on the OCS "involv[ing] exploration, development, or production." 43 U.S.C. § 1349(b)(1). But to achieve jurisdiction, one must show more than "but-for" causation. Jurisdiction must be based on conduct. The phrase "aris[e] out of, or in connection with" permits federal jurisdiction for tort claims "only when those claims arise from actions or injuries occurring on the [O]uter Continental Shelf." *San Mateo II*, 32 F.4th at 753. A test requiring only some connection

between a tort and OCS activities has no limiting principle. *Id.* at 751 (citing *Maracich v. Spears*, 570 U.S. 48, 60 (2013)).

Other circuits have applied a broad "but-for" standard. Yet these cases dealt with claims having a "direct physical connection to an OCS operation" or a "contract or property dispute directly related to an OCS operation." *E.g.*, *id.* at 754 (citing *Suncor*, 25 F.4th at 1273). Courts have also required a "sufficient nexus to an operation on the OCS," *id.* (citing *Suncor*, 25 F.4th at 1273), and denied a "'mere connection' between a claimant's case" and OCS operations, *id.* (quoting *Baltimore II*, 31 F.4th at 221).

In *San Mateo II*, we rejected jurisdiction under OCSLA. The defendants contended that the plaintiffs' injuries— allegedly caused by fossil fuel products, wrongful promotion, concealment of hazards, and failure to seek safer alternatives—were due in part to "cumulative fossil-fuel extraction," some of which occurred on the OCS. *Id.* at 751. Even acknowledging that the removal statute does not require "but-for" causation strictly, we held that the connection between the limited OCS activities and the plaintiffs' injuries was "too attenuated." *Id.* at 754. The alleged injuries occurred in local jurisdictions. *Id.* at 749–50. And the complaints did not refer to OCS activities; they targeted the nature of the defendants' products, knowledge of harm, and concealment. *Id.* at 750.

Defendants' sporadic OCS activities cannot shoehorn OCSLA jurisdiction for just any tort claim. The parties agree that some Defendants engaged in exploration, development, and production on the OCS. *Sunoco*, 2021 WL 531237, at *3. If that were the test, then Defendants might have an argument. Yet federal jurisdiction does not

exist because oil and gas companies' OCS activities are too attenuated and remote from Plaintiffs' alleged injuries.

Plaintiffs contend that oil and gas companies created a nuisance when they misled the public. But just because Defendants were allegedly trying to hoodwink the public about harm from oil and gas operations—partially occurring on the OCS—does not mean that OCS activities caused Plaintiffs' injuries. The connection is too tenuous.

Indeed, Plaintiffs' claimed injuries from Defendants' deceptive practices do not stem from activities on the OCS, even if OCS-produced oil accounts for 30% of annual domestic production, as Defendants assert. As the district court stated, "failing to warn and disseminating information about the use of fossil fuels have nothing to do with such direct acts or acts in support" of OCS operations. *Id.*

Ruling for Defendants would "dramatically expand [OCSLA]'s scope" because "'[a]ny spillage of oil or gasoline involving some fraction of OCS-sourced oil' or 'any commercial claim over such a[n OCS-sourced] commodity'" could lead to removal. *Suncor*, 25 F.4th at 1273. A statute about OCS fossil fuel should not let oil and gas companies remove nearly every suit, no matter how remote the tie to the OCS. *See San Mateo II*, 32 F.4th at 752 (citing *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 479 n.7 (1981)); *Baltimore II*, 31 F.4th at 232 ("Any connection between fossil-fuel production on the OCS and the conduct alleged in the Complaint is simply too remote."); *Shell Oil*, 35 F.4th at 60 (noting that the broad OCSLA jurisdiction the energy companies advocated was "a consequence too absurd to be attributed to Congress").

Defendants ask us to build a bridge too far to reach federal jurisdiction under OCSLA.  Because such a construction would lead to unstable results, we refuse.

IV

This case is about whether oil and gas companies misled the public about dangers from fossil fuels.  It is not about companies that acted under federal officers, conducted activities on federal enclaves, or operated on the OCS.  Thus, we decline to extend federal jurisdiction.

**AFFIRMED.**